*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO SEPTEMBER 15, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | 1:26-cr-8-01-JL-TSM |
| v. | March 24, 2026 |
| | 2:58 p.m. |
| JUSTIN JACKSON | |

# TRANSCRIPT OF WAIVER AND CHANGE OF PLEA HEARING BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government: Matthew Hunter, AUSA
United States Attorney's Office

For the Defendant: Jeffrey David Odland, Esq.
Wadleigh, Starr & Peters PLLC

Court Reporter: Liza W. Dubois, RMR, CRR
Official Court Reporter
United States District Court
55 Pleasant Street
Concord, New Hampshire 03301
(603)225-1442

P R O C E E D I N G S

THE CLERK: This court is in session and has for consideration a waiver/plea hearing in criminal matter 26-cr-8-01-JL-TSM, United States of America vs. Justin Jackson.

Sir, would you please stand and raise your right hand.

(Defendant sworn.)

THE DEFENDANT: Yes, ma'am.

THE CLERK: Thank you. Please be seated.

MR. ODLAND: Your Honor, my client had a question for me right as the Court was taking the bench, so if I could just have one moment.

THE COURT: Take your time.

MR. ODLAND: Your Honor, I think I need to talk to my client in private because he has an ear infection going on and he can't hear me at counsel table. Very briefly. I apologize.

THE COURT: How do you want to do that? I mean, do you want to do it here or do you want to step out into the -- what's permissible from the court security officers? Can they do it out there?

U.S. MARSHAL: We can do it in there, sir.

MR. ODLAND: We would could just step -- it will be brief.

THE COURT: No, no, whatever you need.

So we're not on the record right now.

THE CLERK: No.

(Recess taken from 3:00 p.m. until 3:07 p.m.)

THE CLERK: This hearing is back in session.

THE COURT: Please be seated.

Are we all set to go?

THE DEFENDANT: Yes.

THE COURT: All right.

THE DEFENDANT: Yes, your Honor.

THE COURT: We're here for Mr. Jackson's entry of a guilty plea to four felony counts involving firearms. He's represented here by defense counsel, Jeffrey Odland. AUSA Matt Hunter is here for the prosecution.

What I've got here, Mr. Jackson, is a document with your name and docket number on it. It's a plea agreement. It's 24 pages long and it looks like you signed it on page 23 and your lawyer signed it on page 24. Or, actually, it looks like -- it actually looks like 25 pages. It's a 25-page plea agreement. It says 24 on the bottom of page 24, but it's actually 25 pages, at least by my copy, the one that the Court has. Anyway, it doesn't matter. You signed it.

THE DEFENDANT: Yes, your Honor, I signed it.

THE COURT: Do you remember signing it?

THE DEFENDANT: Yes, your Honor, I remember signing that.

THE COURT: Did you -- I understand that your lawyer read this with you line by line?

THE DEFENDANT: Yes, your Honor.

THE COURT: Yup. And when he finished with that, do you feel like you understood it?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Tell me what you did, Mr. Odland, to make sure your client understood this agreement.

MR. ODLAND: A few things, your Honor.

We reviewed the paperwork over two meetings, a meeting that occurred on the 17th and then a second meeting that occurred on the 19th when the document was signed. During the meeting on the 17th, I can tell your Honor that I reviewed the paperwork with Mr. Jackson verbatim during that meeting with -- with one exception, which is that we had -- we reviewed the superseding information, which contains the laundry list the many firearms that are involved in the case, and in the portions of the plea agreement that reference those firearms, we had agreed to not review verbatim the firearms as they're listed, the 44 firearms, in the plea agreement. Beyond that, all the language in the plea agreement we reviewed.

We then met a second time on the 19th. I guess for the record I would note the purpose of reviewing further on the 19th was in part that I found the language of Section 2 of this plea agreement to be quite difficult to review with my client.

THE COURT: It's funny, I raised that with the prosecutor myself when you went out. I just said this was difficult to read. And it was. Yeah.

MR. ODLAND: I had some questions of the government with respect to what their theory was on one of the charges, Count Three of the superseding indictment --

THE COURT: Yup.

MR. ODLAND: -- and I also wanted to print out the statutes that underlie this and just review the statutory language with my client --

THE COURT: Sure.

MR. ODLAND: -- because I thought that was clearer, frankly, to explain what the elements of those offenses are. So we did that --

THE COURT: Yeah.

MR. ODLAND: -- on the 19th. And then having done both those reviews -- we didn't then rereview the plea agreement on the 19th. We just focused on those elements. And with the two having been done, my client wished to sign the plea agreement. We signed it at that time.

THE COURT: All right.

Did you hear what he said?

THE DEFENDANT: Yes, I heard what he said.

THE COURT: Is that all true?

THE DEFENDANT: It's all true, your Honor.

THE COURT: Mr. Odland, did you go over with Mr. Jackson the nature of each of these four charges, what they're about, how they're proven in court? Did you cover all that?

MR. ODLAND: I have, your Honor.

THE COURT: What about defenses? Did you raise with him defenses that he might be able to assert and did you discuss with him the -- you know, the exculpatory evidence that he knows about his own conduct and how it might be used in his case?

MR. ODLAND: We discussed potential defenses, your Honor, yes.

THE COURT: Okay.

Is that all true?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Are you satisfied with your lawyer and the work he's done for you in this case?

THE DEFENDANT: What was that?

THE COURT: Are you satisfied with your lawyer and the work he's done for you in this case?

THE DEFENDANT: Yeah. For the most part, yes, your Honor.

THE COURT: Well, for the most part?

THE DEFENDANT: For the most part, your Honor.

THE COURT: Well, that's -- that's a problem.

THE DEFENDANT: That's a problem? Sorry about that.

THE COURT: No, that's okay. Your job is to answer these questions truthfully and you're doing it. So --

THE DEFENDANT: Correct.

THE COURT: -- no need to apologize.

THE DEFENDANT: I've expressed my -- my concerns to him, you know --

THE COURT: Yeah.

THE DEFENDANT: -- and we're working through it, but --

THE COURT: All right.

THE DEFENDANT: You know, I --

THE COURT: Well, here's the thing. After you enter a guilty plea and if you're convicted of these charges, because that's what entering a guilty plea is --

THE DEFENDANT: Uh-huh.

THE COURT: -- and I go through this with you, I'm not going to be that open later on to you telling me, well, I -- I wasn't that satisfied with my lawyer, so I shouldn't have done that.

THE DEFENDANT: Yeah, well, that's fine. I won't do that. That's fine.

THE COURT: No, but, see, you have an obligation to do that if it's actually true.

THE DEFENDANT: Right.

THE COURT: And there can be times when you're not satisfied with your lawyer. It happens in court --

THE DEFENDANT: Right.

THE COURT: -- sometimes. It doesn't always matter, but sometimes it does.

THE DEFENDANT: Yup.

THE COURT: So what I'm trying to find out here is what's the problem.

THE DEFENDANT: The problem is he's too busy, sir.

THE COURT: Yeah. The --

THE DEFENDANT: He --

THE COURT: -- good ones are always busy.

THE DEFENDANT: Right. That's a problem. I'm not saying he's not good. I'm just saying, like, for example, like right here, I just yelled at him here, I spoke to him exclusively, and I said, why wait until the last second all the time. We can't wait until the last second. I want to be able to -- I have a learning disability. I need to process a little different than most people.

THE COURT: Sure.

THE DEFENDANT: I can't wait until the last second to try to process something. It takes me a little longer.

THE COURT: Go over a new issue right at the last minute.

THE DEFENDANT: Right. I can't -- I can't just do

that right then. You know what I'm saying?

THE COURT: Okay.

THE DEFENDANT: And you walk in and he's trying to tell me about something about somebody that stopped before we had to walk out. That's not fair to you or myself.

THE COURT: Well, that's okay. We're used to that in court. It actually happens a lot.

THE DEFENDANT: Yeah.

THE COURT: Let me ask you this then.

Is there any last-minute issues that you need some more time to talk about with your lawyer? Because I want --

THE DEFENDANT: No, we just did it. We're good now, I believe, right?

MR. ODLAND: Well, it's up to you.

THE COURT: That's up to you.

THE DEFENDANT: Well, I'm good. I -- I spoke my piece. I -- you know.

THE COURT: All right. Let me ask you this.

When -- you don't tell me what you said to each other --

THE DEFENDANT: Okay.

THE COURT: -- but you spoke your piece. Do you feel like he understood you?

THE DEFENDANT: I feel like he got the gist. I --

THE COURT: All right. And when he responded to

you, did you understand him?

THE DEFENDANT: Yeah, I understood him.

THE COURT: That's what's important.

THE DEFENDANT: Okay.

THE COURT: Okay. All right. Is there anything you want to let me know about about any reservations you have before we go forward?

THE DEFENDANT: What does that mean?

THE COURT: Do you have any doubts about going forward that you're concerned about?

THE DEFENDANT: No, your Honor. I'm good.

THE COURT: Okay. All right then. I'm going to ask you some questions then.

What I have to make sure is that, one, you really want to do this, you want to actually plead guilty to four charges, and, second, that you know what you're giving up, you understand what rights you're giving up.

THE DEFENDANT: (Nods head.)

THE COURT: Because you give up rights when you enter a guilty plea.

THE DEFENDANT: Right.

THE COURT: You follow me?

THE DEFENDANT: Yup.

THE COURT: All right. So I'm going to ask you a bunch of questions about it. All you have to do is answer

them.

THE DEFENDANT: Yup.

THE COURT: Number one, answer them out loud, and you're doing that just fine already. You have to answer out loud because we're making a record.

THE DEFENDANT: Yup.

THE COURT: That's number one.

THE DEFENDANT: I understand.

THE COURT: Number two, you've got to tell the truth. If --

THE DEFENDANT: That --

THE COURT: If you give an answer that's not true, it could hurt you later. It could make your sentence more severe or it could result in new charges, which you don't want.

THE DEFENDANT: Correct.

THE COURT: So the -- it's easy to avoid that part. Just tell the truth.

THE DEFENDANT: I'm guilty of that to a T.

THE COURT: Okay. Fair enough.

Third, if I ask you something -- this is important for what we just discussed. If I ask you something that confuses you or doesn't make sense to you, it sounds like legalese, don't answer it.

THE DEFENDANT: All right.

THE COURT: Ask me to explain it --

THE DEFENDANT: Okay.

THE COURT: -- and Mr. Odland and I, we'll take whatever time it takes to make sure you understand. Because I don't want the record to look like you understood something if you didn't really understand it.

THE DEFENDANT: Correct.

THE COURT: And I will take whatever time it takes. That's your right. It's very important. You with me?

THE DEFENDANT: Yeah, I'm with you.

THE COURT: Okay.

THE DEFENDANT: Trust me. That was one of our problems we just had because I didn't quite understand something --

THE COURT: Yeah.

THE DEFENDANT: -- so I had to go back to it.

THE COURT: It's interesting. One reputation that Mr. Odland has is he takes the time it takes to break it down and explain it.

THE DEFENDANT: Yup.

THE COURT: So -- and that's our job. So, look, anything I ask you, if it doesn't sound completely understandable, just say, Judge, I need you to break that down.

THE DEFENDANT: Okay.

THE COURT: All right?

THE DEFENDANT: (Nods head.)

THE COURT: Okay. So there's four charges here, as I can -- as far as I can tell, four charges that you intend to plead guilty to.

The first -- the first -- I'm going to go in a different order than the plea agreement does.

THE DEFENDANT: Okay.

THE COURT: The last charge is just possession of a firearm by somebody who's not allowed to possess a firearm, unlawful possession of a firearm. All right? That's the fourth -- that's the fourth offense that you're charged with. And that has about half a dozen elements of proof that you have to -- that have to be proven about you before you could be convicted.

First is that you possessed something, you had something in your possession; second, that it was a firearm or ammunition.

Understand?

THE DEFENDANT: Yup.

THE COURT: All right. Third, that you knowingly possessed a firearm; in other words, it wasn't like by accident that it was in your car or your coat or something like that and you didn't know about it. You knew you possessed the firearm. You with me?

THE DEFENDANT: Correct.

THE COURT: Okay.

THE DEFENDANT: It means it was in my hand.

THE COURT: Well, it can be in your hand, but it could be -- it could be in your glove compartment, it could be in your backpack. As long as you knew. Do you follow me?

THE DEFENDANT: Yeah. Okay. Now I understand that, yeah.

THE COURT: All right. Next, that at the time you possessed that, you had already been convicted of a misdemeanor under state law that has the use of physical force or a weapon committed by you against a victim that you were living with, like a spouse or person in your family or a live-in girlfriend or something like that. Are you with me?

THE DEFENDANT: Yup.

THE COURT: Okay. Fifth, that at the time you possessed it, you knew you had been convicted of such a crime sometime in the past. Understand?

THE DEFENDANT: Yup.

THE COURT: And, last, that the gun you possessed at some point crossed a state line. Not necessarily with you, but at some point in its existence, since it was manufactured or the parts were manufactured, something crossed a state line.

All right. That's what they have to prove on that possession of a gun charge. Understand?

THE DEFENDANT: Yup.

THE COURT: All right. Another one -- another

charge that's kind of simple is the sale of a firearm in furtherance of a felony.

Now, what that means is -- in general it means you sold a gun to somebody, either knowing -- either when you knew or you should have known they were going to commit a crime with it. Okay?

So, now, here's the elements they've got to prove on that charge. They've got to prove, number one, that you sold or disposed of something, number one; number two, that what you sold or disposed of was a firearm. Understand?

THE DEFENDANT: Yeah.

THE COURT: All right. Third, you did it knowingly; when you -- it wasn't something that like -- like, for example, you didn't sell somebody a refrigerator and there wound up being a gun inside. You knew there was a gun you sold. All right?

THE DEFENDANT: Yup.

THE COURT: All right. Next, that the buyer, the person that took possession of the gun from you, intended to -- that -- intended to sell it or dispose of it in furtherance of a felony, connected with a crime that's a felony crime. Do you understand?

THE DEFENDANT: Yeah.

THE COURT: And, lastly, that you knew that; you knew that that person was going to use that gun in some way in

furtherance of a crime, a felony. You knew it or, if you didn't know it, you should have known it based on the circumstances. Understand?

THE DEFENDANT: I do. That's -- that's what we had a problem with at first that we had to go out and straighten out.

THE COURT: Okay. Either knowing it or should have known.

THE DEFENDANT: We straightened that out, so we do understand that very well now.

THE COURT: Okay. Good.

Now, these other two charges are called conspiracies and these are a little bit different. They're not so much straight-up crimes like possessing a gun or selling a gun. These are agreements to commit a crime. So they're a little different.

THE DEFENDANT: Yeah.

THE COURT: The thing about these conspiracies is you can be guilty of them even if the crime never was -- wound up being committed, the underlying crime. Like suppose -- you've probably heard of people conspiring to sell drugs, right?

THE DEFENDANT: Yeah.

THE COURT: Sometimes they'll conspire to sell drugs, but there's no drug sale. There's still a crime, the

conspiracy. That's what these are.

THE DEFENDANT: Yeah.

THE COURT: Are you with me so far?

THE DEFENDANT: Yeah.

THE COURT: All right. So the first one is a conspiracy to commit a straw purchase. A straw purchase is a -- a gun buy when the person buys it usually for someone else who's not allowed to buy guns. All right?

THE DEFENDANT: Right.

THE COURT: Okay. So here's the conspiracy.

What they have to prove is number -- is, first of all, that there was some type of agreement; two -- at least two people understood each other that something was going to happen, that they were going to do something together. That's number one. All right?

Number two, the agreement was to purchase firearms, buy guns.

THE DEFENDANT: Yup.

THE COURT: Okay. Third is -- is that you joined in that agreement, you participated.

THE DEFENDANT: Yup.

THE COURT: All right? And fourth is that you did so willfully.

THE DEFENDANT: Yup.

THE COURT: That means -- that means a few things.

One, you knew about the agreement, you knew that you joined the agreement, you got involved on purpose, it wasn't by accident, right?

THE DEFENDANT: Yup.

THE COURT: And then, third, your objective, your goal, was that the firearms would be purchased. Follow me?

THE DEFENDANT: Yup.

THE COURT: All right. Just give me one minute.

Ah, I said purchase. It's not just purchase. It's straw purchase.

THE DEFENDANT: Uh-huh.

THE COURT: Okay? So what the agreement was, what everybody knew, at least what you knew --

THE DEFENDANT: Uh-huh.

THE COURT: -- was not just that it was a gun buy, but it was kind of a phony gun buy, a buy by a person who really wasn't going to be the owner of the gun.

THE DEFENDANT: Correct.

THE COURT: Okay. You understand that?

THE DEFENDANT: Yup, I understand that.

THE COURT: All right. Last charge, the conspiracy to traffic in firearms. That one, again, it's one of these conspiracy crimes; it's an agreement to commit a crime.

So, number one, that there was an agreement; number two, the agreement was to commit a crime, in this case,

firearms trafficking, unlawful purchase and sale of firearms. All right?

THE DEFENDANT: Right.

THE COURT: Third is that, again, you joined in the agreement, you participated.

THE DEFENDANT: Correct.

THE COURT: And, last, you did it willfully; you did it on purpose, you knew about the agreement, you knew the agreement was to commit a crime and that your goal, your objective, was that firearms trafficking would occur.

THE DEFENDANT: (Nods head.)

THE COURT: You with me?

THE DEFENDANT: Yeah, I'm with you.

THE COURT: All right. So those are the four crimes --

THE DEFENDANT: Correct.

THE COURT: -- that you're -- you're going to plead guilty to today if you go through with this.

Now, I'm going to ask the prosecutor now to explain the evidence in the case. It's what's written here in this agreement. He might not read it. He might paraphrase it. So I need you to listen to him carefully. Because I might, maybe, ask you some questions about what he says after he's done talking.

THE DEFENDANT: Okay.

THE COURT: So we're both going to listen carefully. Go ahead.

MR. HUNTER: Thank you, your Honor.

Had this case proceeded to trial, the government would introduce evidence of the following facts, as well as the facts laid out in the plea agreement, that would prove the elements that the Court just went over beyond a reasonable doubt. And this is all as laid out in pages 5 through 12 of the plea agreement, of the written plea agreement.

THE COURT: All right. To the extent you're going to read from that, which is fine, go slowly for the reporter.

MR. HUNTER: Thank you, your Honor.

This investigation started with the ATF, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and Homeland Security Investigations discovering that there were firearms that were purchased in the United States and ending up in Canada.

They traced some of those firearms, and in tracing them discovered that two of the defendants' coconspirators, Dustin Tuttle and Melissa Longe, were the purchasers of those firearms, having purchased them in New Hampshire.

Each of the defendants' coconspirators have since pleaded guilty to firearms offenses related to this conspiracy.

As laid out in the plea agreement and in the superseding information, the conspiracy involved at least 44

firearms, which are listed in both documents, and the government has traced those firearms to this firearm -- to this interstate firearms trafficking conspiracy.

In sum, the defendant enlisted Melissa Longe and Dustin Tuttle to purchase these firearms at various locations in New Hampshire on behalf of members of the Mohawk Reservation in New York state. The defendant did this knowing or having cause to know that these firearms would then be trafficked further, which is itself a felony.

For example, in March or April of 2024, members of the Mohawk Reservation in New York came to the defendant and asked that he and his coconspirators purchase as many firearms as they could. In addition, as -- again, as laid out in the plea agreement, a number of these firearms, nine of them, in fact, were discovered in Canada at various crime scenes and two were later discovered at crime scenes in the United States.

Generally, the way this conspiracy operated, these individuals from New York would come to Vermont, where the defendant lived, and they would speak with him and sometimes his coconspirators, providing a list of firearms that they wanted them to purchase. On some occasions, they would come and scope out gun stores and identify specific firearms that they would like to purchase. And then Jackson, the defendant, would travel to New Hampshire with Longe or Tuttle to purchase the firearms at different gun stores in the state of

New Hampshire, some of which are listed in the plea agreement.

Jackson would then take possession of those firearms and bring them back to his residence in Vermont and would sell those firearms to members of the Mohawk Reservation who would travel from New York to Vermont to purchase the firearms from him.

As laid out in the plea agreement, the defendant was later interviewed and, when interviewed, he admitted to trafficking firearms to the reservation in New York that was near the border. He admitted that he used Longe and Tuttle to straw purchase the firearms as he knew that he could not legally purchase firearms.

Through the investigation, investigators obtained court records that demonstrate that the defendant is a -- is a prohibited person and cannot possess firearms legally as on or about May 14th, 2002, he was convicted of a misdemeanor domestic violence offense that renders him a prohibited person under the federal gun laws.

In total, to date, there were a total of 44 firearms that were trafficked as part of the conspiracy. Those firearms are listed in multiple counts of the superseding information and in the plea agreement.

That is a summary of the evidence, your Honor.

THE COURT: Thank you, sir.

All right, Mr. Jackson. Did you hear what he said?

THE DEFENDANT: I heard what he said, yes.

THE COURT: Is it all true?

THE DEFENDANT: 95 percent of it, probably, is true, yes, sir.

THE COURT: What's not true?

THE DEFENDANT: Well, I did not know that they were -- at the point in time that they were going to do more things with it or when they come down and asked to -- when they come down and asked to buy as many guns as we could, they had money with them and said they -- we talked to them and they said that they wanted to get guns --

THE COURT: Who's they, the --

THE DEFENDANT: Blade and --

MR. ODLAND: He's referencing the Native Americans, your Honor.

THE COURT: Right. You're talking about the members of the Mohawk --

THE DEFENDANT: Yes.

THE COURT: -- tribe?

THE DEFENDANT: Yes.

THE COURT: The recipients -- the eventual recipients of the guns.

THE DEFENDANT: Yup.

THE COURT: Okay.

THE DEFENDANT: So the -- how it started is they

said that they -- they were -- had to order guns through -- there wasn't a gun store up there, blah, blah. So I was not aware they were going to do other crimes and stuff like that with them at first, you know what I'm saying?

THE COURT: All right. Now -- all right. Finish your point. I want to ask you a question.

THE DEFENDANT: So -- so at first we were just buying them, just thinking they were going target practicing and stuff, and then it started getting suspicious. So then -- then I figured it out, put two and two together, but by then we were too far in it, upside down, whatever, and we were trying to get out of it and --

THE COURT: I see.

THE DEFENDANT: -- by that time, the agents were in it, too. But by that time -- that's how I am agreeing to knowing, because you only have to know on one occasion that there was something fishy. And I did figure out something was fishy, so then I was trying to stop it and that's how it all come about.

So --

THE COURT: I see.

THE DEFENDANT: -- that's why I agreed to that. That's why it's 95 percent accurate, because at first I did not know, but I put it together.

THE COURT: Yeah. Sounds like what you're telling

me is when you first started doing this, you didn't know that they were going to commit -- intended to commit crimes with those firearms --

THE DEFENDANT: Correct.

THE COURT: -- that eventually during the conspiracy you did figure it out --

THE DEFENDANT: Correct.

THE COURT: -- and by the time it was over, you had been conducting it with that knowledge.

THE DEFENDANT: Correct.

THE COURT: Okay. Understood. All right.

All right. I want to talk about the penalties that you face, consequences of a guilty plea.

First of all, these are felonies. I looked at your record and you spent a lot of time in Keene District Court, but what that tells me is you didn't have a felony record; you had a long misdemeanor record.

THE DEFENDANT: Right.

THE COURT: Okay. This is a felony.

THE DEFENDANT: Yeah.

THE COURT: The thing about -- you've probably heard, you know, about -- some of these misdemeanors, a lot of crimes in New Hampshire law, you can have them annulled, expunged, erased from your record.

THE DEFENDANT: Yup.

THE COURT: You can't do that with a federal felony. That's going to be on your record permanently. Do you understand?

THE DEFENDANT: Yup.

THE COURT: How old are you?

THE DEFENDANT: 46.

THE COURT: Let me ask you these questions. I should have asked you this before.

You're 46 years old?

THE DEFENDANT: Yes.

THE COURT: Are you married?

THE DEFENDANT: Divorced, sir.

THE COURT: Children?

THE DEFENDANT: Two children.

THE COURT: How old are they?

THE DEFENDANT: I'm dyslexia (sic). I'm going to guess 26 and 27, sir.

THE COURT: Okay. They're adults.

THE DEFENDANT: They're adults, yes, sir.

THE COURT: Okay.

THE DEFENDANT: I have -- so I have two children. Melissa Longe, my girlfriend for 11 years now -- well, we were together until we got -- right up until this happened and then she turned. Whatever. Anyways, she has three kids and her kids also call me Dad and one of her kids is handicapped and

she stays with me --

THE COURT: Okay.

THE DEFENDANT: -- at my house.

THE COURT: But right now you're detained, right?

THE DEFENDANT: Yes. Right now I'm in the cage, sir.

THE COURT: Okay. So you have a couple of kids and you're --

THE DEFENDANT: And grandkids.

THE COURT: And you're -- and grandkids. And your girlfriend has three children --

THE DEFENDANT: Yes.

THE COURT: -- and one of them was living with you up until --

THE DEFENDANT: Yeah, even -- every time Missy gets mad and leaves or whatever, she -- her daughter still stays, resides with me --

THE COURT: I get it.

THE DEFENDANT: -- and her daughter resides -- her daughter -- we call her our daughter, but just for you, so you understand --

THE COURT: Totally get it. Totally get it.

THE DEFENDANT: -- her daughter is used to the dad figure that I've been for her.

THE COURT: Right.

THE DEFENDANT: And I -- I provide for her and the grandson or her and her son. Her son's autistic.

THE COURT: I see.

THE DEFENDANT: So --

THE COURT: All right. Now, you told me -- you told me -- well, tell me how far you got in school.

THE DEFENDANT: I believe it was ninth grade, sir.

THE COURT: All right. Where'd you go, Keene High?

THE DEFENDANT: No. I went to Brattleboro elementary school -- Vernon Elementary School and Brattleboro High School.

THE COURT: Gotcha. Okay. You had a mental health diagnosis at some point?

THE DEFENDANT: Yes, your Honor.

THE COURT: Anxiety?

THE DEFENDANT: Anxiety, yes, your Honor.

THE COURT: Okay. And you're on medication for that?

THE DEFENDANT: Yes.

THE COURT: You don't remember what the name of it is?

THE DEFENDANT: No.

THE COURT: When do you take -- when do you take it?

THE DEFENDANT: Around -- between 7:00 and 9:00. There's no consistency in the jail right now, so between 7:00

and 9:00 a.m., whenever the med cart comes in.

THE COURT: In the morning?

THE DEFENDANT: In the morning.

THE COURT: All right. Did you get it this morning?

THE DEFENDANT: Yes, sir.

THE COURT: All right. So you're up-to-date on your medication?

THE DEFENDANT: Yes, I'm up-to-date on my medication.

THE COURT: All right. I understand you also have some antibiotics, but that's for your body, not your mind.

THE DEFENDANT: I got fluid behind my eardrums right now. So I've had 12 sets of tubes put in my ears --

THE COURT: Yup.

THE DEFENDANT: -- in my life and I keep getting fluid behind my eardrums.

THE COURT: Oh.

THE DEFENDANT: So if they can't dry it up right now, they're going to have to give me more tubes again.

THE COURT: Uh-huh.

THE DEFENDANT: Everything sounds like a blown speaker right now.

THE COURT: But for mental health, it's just that anxiety med?

THE DEFENDANT: Right, right.

THE COURT: Okay. Are you feeling okay right now?

THE DEFENDANT: Yes.

THE COURT: Okay. All right then.

Getting back to this --

THE DEFENDANT: Yeah.

THE COURT: -- the consequences.

THE DEFENDANT: Yup.

THE COURT: It's a felony. If you're not a citizen, you're going to be deported from the United States. Do you understand that?

THE DEFENDANT: Yeah. I'm a citizen.

THE COURT: Okay.

THE DEFENDANT: I was born in Keene, New Hampshire.

THE COURT: If -- there's certain rights and entitlements you can lose by being a convicted felon. Like, for example, you lost the right to possess firearms when you were convicted of that domestic violence misdemeanor, right? This is similar. Now it's a felony. No more guns. You can never possess guns. Do you understand?

THE DEFENDANT: Yup.

THE COURT: All right. You can also lose your right to vote. You can lose the right to serve on a jury or run for office or hold office, things like that. Do you understand?

THE DEFENDANT: Yes.

THE COURT: There's also benefits and entitlements

that you can be denied, for example, like public assistance for food, clothing, and shelter, eligibility for education, eligibility for certain jobs, eligibility for job training, assistance with housing. All things like that can be --

THE DEFENDANT: Yeah.

THE COURT: -- denied to you based on being a convicted felon. Do you understand?

THE DEFENDANT: Yeah.

THE COURT: Okay.

THE DEFENDANT: I'm worried about my housing where I live right now because I live in a trailer park.

THE COURT: Yeah. Now, but you pay your own rent?

THE DEFENDANT: I pay my own rent and stuff, yes, sir.

THE COURT: Yeah. Well, there might be some rules in that park about no felons.

THE DEFENDANT: There is about no rules -- no felons in that trailer park, so I don't know --

THE COURT: So there could be some consequences there.

THE DEFENDANT: Yup.

THE COURT: The association might say to you, oh, I'm sorry, but you've got to move.

THE DEFENDANT: Yup.

THE COURT: Okay.

THE DEFENDANT: I'm afraid that's going to happen.

THE COURT: So you get it.

THE DEFENDANT: Yeah.

THE COURT: Okay. So there's also the sentence that the Court's going to impose. The Court's going to impose sentence on you when you come back for sentencing. I'm guessing that's, what, July 6th probably? I only remember that because I had another one this morning. July 6th you're going to come back. When you come back for sentencing --

THE DEFENDANT: That sounds so confusing for me. I'm trying to figure that out and I'm -- I can't figure that one out.

THE COURT: I'm going to give it to you straight now. The most -- the most time you can receive on Count One is 25 years' imprisonment. The most you can receive on Counts Two, Three, and Four, 15 years' imprisonment.

Now, that can all be added up. That's -- that's 70 years total. That's not going to happen. Okay? But, technically, legally, that's the most time you can get, 70 years. All right?

THE DEFENDANT: (Nods head.)

THE COURT: Now, maximum fine is $250,000. That's not going to happen either, but technically, legally, it could happen.

THE DEFENDANT: Uh-huh.

THE COURT: Understand?

THE DEFENDANT: Yup.

THE COURT: So far you understand all this?

THE DEFENDANT: I do understand all that.

THE COURT: Good.

Next, there's going to be a $400 fee. That's because there's four felony counts. That's like a processing fee. You've got to pay it. Understand?

THE DEFENDANT: Yup.

THE COURT: You're going to forfeit your interest in the 44 guns and any other criminally derived property in this case. That doesn't mean -- that means to the extent you own any part of that gun, that you own them or have an interest in them, you're giving it up and turning it over to the U.S. Government.

THE DEFENDANT: Correct.

THE COURT: Understand?

THE DEFENDANT: I don't want nothing -- I don't want nothing to do with those.

THE COURT: Okay.

THE DEFENDANT: Yup.

THE COURT: Finally, is there any restitution here?

MR. HUNTER: No, your Honor.

THE COURT: All right. Okay. So that's almost everything.

The last thing is what's called supervised release.

Now, you've never been to state prison --

THE DEFENDANT: Nope.

THE COURT: -- but you probably know people that have been to state prison, I bet.

THE DEFENDANT: Yup.

THE COURT: So are you familiar with parole?

THE DEFENDANT: I'm a little familiar with parole, yes.

THE COURT: Parole is when you go to state prison, Vermont, New Hampshire, whatever, and the parole board meets and sends you home early. Right?

THE DEFENDANT: Yup.

THE COURT: That won't happen in federal court.

THE DEFENDANT: No?

THE COURT: Whatever the number is, you've got to serve the whole thing. There's no parole. Understand?

THE DEFENDANT: (Nods head.)

THE COURT: But there is a thing called supervised release. That just means at the end of your sentence, you're going to be released, but you're going to be supervised. So you'll be on the street again, but you'll have a supervisor, a U.S. probation officer, okay --

THE DEFENDANT: (Nods head.)

THE COURT: -- a person you have to check in with

every so often, you have to probably drug test, things like that.

THE DEFENDANT: Yup.

THE COURT: Now, the way that works, in your case, it can be no more than five years on the first count, no more than three years on the second count. I'm telling you now it'll be five years or less of supervision. Okay.

THE DEFENDANT: (Nods head.)

THE COURT: The way that works is if you obey the rules, after five years or some number under five years, it's over --

THE DEFENDANT: Uh-huh.

THE COURT: -- and the federal court's out of your life. But if you violate the rules, your supervised release status can be revoked and you can be sent back to prison. Now, you can even be sent back longer than you were sent the first time.

THE DEFENDANT: (Nods head.)

THE COURT: That doesn't usually happen, but it's possible. Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. If you understand everything I just told, you totally understand the consequences.

Are there any questions you want to ask me?

THE DEFENDANT: I'm just trying to figure out what

my total sentence is going to be still.

THE COURT: What's it likely to be, right.

THE DEFENDANT: Yup. That's what I'm still trying to figure out.

THE COURT: Yup.

THE DEFENDANT: So I guess my thing is like, yeah, five on one and three on the other or whatever. Like I just want to know, like, really what are we doing, four, five, six, eight, you know what I mean.

THE COURT: Here's the thing. Like you know how -- you know, back in Keene District Court, right --

THE DEFENDANT: Yeah.

THE COURT: -- you pleaded guilty and everybody knew what you were going to get.

THE DEFENDANT: Absolutely. That's what's confusing.

THE COURT: This isn't like that --

THE DEFENDANT: I see that.

THE COURT: -- for a couple of reasons. There's two reasons. One of them is these U.S. Sentencing Guidelines I'm about to tell you about. The other thing is, and I don't want to get into it here --

THE DEFENDANT: Yup.

THE COURT: -- but things can happen between now and your sentence that make it go better or make it go worse. You

with me?

THE DEFENDANT: Yup.

THE COURT: That's all I'm saying.

THE DEFENDANT: Right.

THE COURT: So I can't know right now. Neither can you.

THE DEFENDANT: Yup.

THE COURT: But let's talk about this.

First of all, the guidelines. When I sentence you in July, these guidelines will guide me. They'll make a recommendation about what the number should be. Now, I don't have to follow it. I can give you a sentence that's more severe or more lenient than what the guidelines recommend. Happens all the time. But I have to figure it out. I've got to do the calculations under these guidelines.

THE DEFENDANT: Yup.

THE COURT: I'm sure you've talked to Mr. Odland about these guidelines, right?

THE DEFENDANT: Yup. A lot.

THE COURT: Go ahead.

THE DEFENDANT: I just said a lot. I've talked to him a lot about it because I'm confused.

THE COURT: Because in federal court that's the whole conversation, right?

The only thing you've got to remember here is I'm

going to have to figure out what the guidelines recommend, but I'm not going to have to follow it. Your lawyer can make arguments that I should be more lenient with you. Right?

THE DEFENDANT: Yup.

THE COURT: And the prosecutor might make arguments that I should be more severe with you. But sometimes the prosecutor even says, no, it's okay to be more lenient than the guidelines for these good reasons. It happens all the time. There's no guarantees, but it happens.

THE DEFENDANT: Right.

THE COURT: Okay. The other thing I'm going to read -- well -- and the guidelines are based on two things you should know about. One is how severe the crime is. Now, I'm not going to sugarcoat this with you. These are serious crimes.

THE DEFENDANT: Right.

THE COURT: So the number, the offense level, is going to be kind of high.

There's also your record. You put your record together with the guidelines on -- record together with the offense level, how serious it is, and the guidelines spit out a number and --

THE DEFENDANT: Yeah.

THE COURT: -- I've got to figure out what that is before I figure out if I'm going to follow it. All right? You

understand?

THE DEFENDANT: Yup. I understand that.

THE COURT: All right. The other thing I'm going to read is this report called the presentence report. That's a very detailed report, long, like 10, sometimes 20 pages long, single-spaced, full of facts about you and your crime, about your background, about your health, about your family, all kinds of details about you, and guideline calculations recommendations and the applicable law, federal law. I'll read all that, and so will you and so will Mr. Odland and so will the prosecutors. Everyone's going to read it.

If you disagree with what that report says, you can file objections with me and I'll consider them very carefully before I impose sentence.

THE DEFENDANT: (Nods head.)

THE COURT: Because sometimes -- I'll agree with you sometimes. Sometimes I'll disagree. But I'll figure it out. And you'll -- everything you say will be very carefully considered, everything Mr. Odland says on your behalf.

THE DEFENDANT: Yup.

THE COURT: Okay? Here's the thing, though. You can't take your guilty plea back because you don't like what the report says.

THE DEFENDANT: Correct.

THE COURT: Okay. You understand that?

THE DEFENDANT: I do understand that. We've talked about that. Thank you.

THE COURT: Okay. Next is this plea agreement you've got here. I've read this. It's like a contract between you and the government.

THE DEFENDANT: Yup.

THE COURT: You've each made a promise to the other side, several promises, and you -- and you make those promises in exchange for what the other side promises because you both want something out of this arrangement.

THE DEFENDANT: Yup.

THE COURT: Now, you've -- now, here's what you've agreed.

First of all, you agreed that this case does not have to be presented to the grand jury. Usually you can't be charged with a felony, whether it's here or in New Hampshire state court, unless a grand jury indicts you, issues an indictment. That hasn't happened here because you've agreed that they don't have to spend time presenting it to a grand jury; you're willing to come right to court and face the charges. Understand?

THE DEFENDANT: Yup.

THE COURT: Okay. Normally that can't happen. They can't -- they can't bring you to court without indicting you in front of the grand jury. The grand jury is just a group of

people who hears what the prosecution says you've probably done and they decide to charge you or not charge you. If they don't charge you, don't indict you, you can't be brought to court.

THE DEFENDANT: Uh-huh.

THE COURT: But if they do, then you're in court.

Now, you've agreed that that doesn't have to happen here. They don't have to spend time on that.

THE DEFENDANT: Correct.

THE COURT: Is that your wishes?

THE DEFENDANT: That's my wishes, yup.

THE COURT: Okay. Don't tell me what you said, but did you talk to Mr. Odland about that before you made the decision?

THE DEFENDANT: Numerous times, yes.

THE COURT: Okay. Mr. Odland, do you know any reason why your client shouldn't waive indictment?

MR. ODLAND: No, your Honor.

THE COURT: Okay. So I have a written waiver of indictment here that has basically the same conversation we just had, that you understand you have a right to be indicted before you face charges but you don't want to exercise that right.

THE DEFENDANT: Correct.

THE COURT: Okay. You've signed it and you signed it with your lawyer. I'm going to find that you have

knowingly, voluntarily, and intelligently waived your right to have the case presented to a grand jury before you face the charges.

THE DEFENDANT: Correct.

THE COURT: Okay. That's the first thing you agreed to do.

The second thing you agreed to do, plead guilty to these four charges, what you're doing right now. And if you go through with it, you'll have done that.

Next, you agreed that what the plea agreement says, what -- how it summarizes the evidence under Section 3, the offense conduct section, it -- you've agreed that it -- it's true and accurate and can be proven in court.

THE DEFENDANT: Which one is that?

THE COURT: And your lawyer told me he read that to you word for word, you confirmed that --

THE DEFENDANT: Yeah.

THE COURT: -- and the prosecutor just talked about it.

THE DEFENDANT: Yeah.

THE COURT: Do you understand?

THE DEFENDANT: Yes, I do understand.

THE COURT: Okay. Now, they've agreed to do some things, too. First of all, they've agreed you should get some lenience, some -- you should get a break on your guideline

score, on the offense level, because you admitted what you're accused of.

THE DEFENDANT: Yup.

THE COURT: It's called accepting responsibility and you can get two levels or three levels, depending on the situation, knocked off your offense level which will lower the guideline sentencing range and lower the recommendation.

THE DEFENDANT: Uh-huh.

THE COURT: You're entitled to that, according to the prosecutor, according to their agreement, unless you violate this agreement in some way, you break -- you break your word, you -- you don't keep up with the commitments you've made here. You understand?

THE DEFENDANT: Correct, yup.

THE COURT: Okay. Secondly, there's an agreement here on a couple of things about your sentence. This is important stuff.

First of all, they've agreed that the number of firearms involved in this case is 44. That's really important because that offense level will be driven by the number of guns involved. And they've agreed it's 44 not more -- not more than 44. Understand?

THE DEFENDANT: Yup.

THE COURT: Now, it could turn out that the presentence investigation report says, actually, Judge, there

were 66 guns involved, but the prosecutor says it doesn't matter, it's 44 as far as we're concerned. And that's what matters. Understand?

THE DEFENDANT: Yup. Yup, I do understand that. Thank you.

THE COURT: Second, they've agreed that when they recommend the sentence, it's going to be at the bottom of the guideline sentencing range. Whatever that range is, they're going to recommend the bottom number.

I'm just going to make up a number right now --

THE DEFENDANT: Yup.

THE COURT: -- off the top of my head. Suppose the guideline sentencing range is 72 to 78 months' imprisonment. Right? I have no idea. It could be less, could be more.

THE DEFENDANT: Right.

THE COURT: I just made it up. If it's 72 to 78, the prosecutor's going to stand up in court and say, Judge, 72 --

THE DEFENDANT: Uh-huh.

THE COURT: -- no higher. So that's important.

Do you understand?

THE DEFENDANT: Yeah.

THE COURT: Now, I don't have to follow that, but it's very important that that's what they say. Do you follow me?

THE DEFENDANT: Yeah, I do follow you so far.

THE COURT: All right. There's an agreement here, we talked about this, that you're going to forfeit any interest you have in the 44 guns and any other criminal property in this case to the U.S. Government.

THE DEFENDANT: Correct.

THE COURT: All right. There's one more thing.

Actually, Mr. Odland, anything else you want me to cover here in this agreement? I've covered what I think are the salient terms. I'm going to do the appeal waiver in a minute, but that's different.

MR. ODLAND: I apologize, your Honor. I don't know if we've reviewed trial rights waiver and the appellate waiver, but I think as far as the terms, the mutual terms under the agreement, no, there's nothing I would ask you to review.

THE COURT: What about you?

MR. HUNTER: Those are the material terms, your Honor.

THE COURT: All right. There's one more term, it's you're giving up your right to appeal, but we're going to talk about that in a minute.

THE DEFENDANT: Okay.

THE COURT: All right. Last thing we cover is your rights, your constitutional rights. You have a lot of rights you give up when you plead guilty because there's a lot of

rights attached to a trial. For example, first of all, you have the right to plead not guilty. You never have to plead guilty. You never have to admit anything in court. Do you understand?

THE DEFENDANT: Yup, I do.

THE COURT: You have a right to a jury trial. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You have a right to counsel, in other words, a lawyer to represent you or help you defend yourself or defend you. Understand?

THE DEFENDANT: Correct.

THE COURT: You have a right to see and hear all the evidence, all the witnesses, all the evidence and exhibits, and cross-examine those witnesses. That's called confrontation. That's your right. Understand?

THE DEFENDANT: Correct.

THE COURT: You have a right to defend yourself by presenting your own evidence in court. You have subpoena power to do that and that's called compulsory process, which means you can bring to court any people or evidence you want to present and I would make sure that happened. Understand?

THE DEFENDANT: Correct.

THE COURT: All right. You get to make up your own mind about testifying. You never have to take the witness

stand and answer any questions or explain yourself in any way. Nobody can make you do that. The decision about doing that is yours and yours alone. Understand?

THE DEFENDANT: Yup.

THE COURT: By the way, that also means if you wanted to take the witness stand and answer questions and explain yourself and say anything you want -- except lying, right -- but --

THE DEFENDANT: Right.

THE COURT: -- if you want to take the witness stand, you can say anything you want. Nobody can stop you. The point is the decision about testifying is yours. Get it?

THE DEFENDANT: Yes, I do get it.

THE COURT: Good. If you go to trial, you don't have to prove that you're innocent. The prosecutor's got to prove you're guilty. So all those elements of those four different charges that we talked about, each element has to be proven beyond a reasonable doubt for you to be convicted of each crime individually. The jury would consider them each separately, each offense separately, each element separately. Understand?

THE DEFENDANT: Yup.

THE COURT: You have a right to a unanimous jury. That means on every single count, all four, you'd have a right to a unanimous jury. All 12 would have to agree that each

element of the offense had been proven beyond a reasonable doubt. Understand?

THE DEFENDANT: I do.

THE COURT: Okay. Here's the part about your plea agreement. Normally when you come to court you can challenge the criminal case, you can challenge the investigation that led to your charges, you can challenge the grand jury proceedings, you can challenge anything we do here in court. Even the sentence I give at the end of the case, you can challenge that, too. And you can do all these things even after the case is over.

If you challenge it here in this court after the case is over, it's called a collateral challenge. If you challenge it in a higher court, it's called an appeal. And normally you can do that. The thing is you can't do that because under this agreement, you're giving up your right to challenge an appeal. Do you understand?

THE DEFENDANT: I do.

THE COURT: Okay. There are a few challenges and appeals that you do retain, you do hold on to. For example, the sentence. If I give you a sentence that's higher than the guideline range that the guidelines recommend, you can challenge that or appeal it. Understand?

THE DEFENDANT: Yup.

THE COURT: If Mr. Odland rendered ineffective

assistance of counsel, in other words, if his performance did not meet the standard required by our Constitution, you could have a challenge or an appeal based on that. Understand?

THE DEFENDANT: Yup.

THE COURT: Finally, if the law changed, if the law of drug trafficking changes in some important way that affects the validity of your guilty plea here today, you could maybe challenge it and revisit that issue. Understand?

THE DEFENDANT: Yup.

THE COURT: Okay. So -- but the real point is those little things right there, those are very few things. Normally you have a lot of reasons to challenge and appeal and you're giving them up by this plea agreement. You can't do it.

THE DEFENDANT: Correct.

THE COURT: Okay. So here's the question: Why are you pleading guilty? Because if you have all these rights, why give them up and plead guilty instead of going to trial?

I'm asking you.

THE DEFENDANT: I'm kind of torn on that one because they can prove most of it. How's that? And I'm afraid that what they can prove is that -- I should say one case -- one charge alone was from January '25.

THE COURT: Yeah.

THE DEFENDANT: Okay? If I fought -- if I fight what I -- the little miswording, if you would, if I fight that,

then I could probably get the -- more, you know what I'm saying?

THE COURT: I do.

THE DEFENDANT: So it's probably not worth the little in -- okay.

THE COURT: You see -- okay. That makes sense to me. It's very reasonable and very rational. People make that decision all the time in courts in all 50 states.

THE DEFENDANT: Yeah.

THE COURT: But here's the thing about it that I have to understand. It's definitely reasonable to plead guilty because you think it's going to be better for you if you do --

THE DEFENDANT: Yup.

THE COURT: -- and it's not worth fighting certain things. However, you should never plead guilty to something if you're actually innocent. Never. As a matter of fact, I'm not going to let you. You have to understand that.

THE DEFENDANT: Yeah.

THE COURT: I need to know, if you're going to plead guilty to these four offenses, that you're actually guilty of them. Are you?

THE DEFENDANT: I am guilty.

THE COURT: Okay.

THE DEFENDANT: I am guilty of them.

THE COURT: All right. Now, by the way, you can

have a trial on Counts One and Three and plead to Two and Four, if you want. In other words, you can plead guilty to only some of the charges. Do you understand that?

THE DEFENDANT: Yeah.

THE COURT: You're allowed to do that is all I'm saying. And I just need to make sure you want to plead guilty to all four charges.

THE DEFENDANT: I want to plead guilty to all four charges, yes, sir.

THE COURT: Okay. Do you think it's in your best interest to plead guilty instead of going to trial?

THE DEFENDANT: I think it's in my best interest to plead guilty instead of going to trial, your Honor.

THE COURT: Fair enough.

Did anyone try to coerce you or force you or intimidate you into doing this?

THE DEFENDANT: No.

THE COURT: Has anyone made you any promises that -- like this plea agreement has a lot of promises to you. They're in black and white. We have it in writing. It's going to be on file with the Court.

Are there any other promises made to you to persuade you to plead guilty that I don't know about?

Talk to your lawyer before you answer that.

(Discussion between the defendant and counsel.)

THE DEFENDANT: So I'm going to say this.

THE COURT: Yeah.

THE DEFENDANT: I asked him, he's not really sure how to answer this either, so I'm just going to go ahead and probably say it -- against counsel, I'm going to answer this anyway. How's that?

So -- so I guess what I'm trying to say is when -- the first time that I was approached with the ATF, Sean Hoover worked there and he talked to me. I did not want to talk to them. I wanted to talk to a lawyer first. But then they had my girlfriend, Melissa Longe, in questioning.

So they brought her out. She told me go ahead and just answer the questions and talk to them, so I did -- I did. And I offered to help them in exchange for her --

MR. ODLAND: Can I have a moment, your Honor?

THE COURT: Yeah.

(Discussion between the defendant and counsel.)

THE DEFENDANT: So, anyways, I offered to help them and asked what I had to do. I didn't offer to help. I asked what I had to do to save her and let myself and her -- save, her, Melissa Longe, and Dustin Tuttle, you know, and I would take the charges, you know what I'm saying.

So we started working together, talking and coming up with a plan, and I started doing so. And then Sean Hoover no longer worked there no more and I feel like that whole part

of the equation has dropped off and that's what made me very skeptical about trying to work with anybody else on this because I feel like one whole part of the --

THE COURT: Yeah.

THE DEFENDANT: -- thing is gone.

THE COURT: Yeah.

THE DEFENDANT: And that's what makes me want to fight it, but that's why I also think I'm going to lose more because -- I'm not saying I'm not guilty. I'm just saying that --

THE COURT: Yeah.

THE DEFENDANT: -- the -- does that make sense, what I'm saying to you?

THE COURT: Of course it does. I understand what you're saying. Those are issues, considerations, that Mr. Odland might even bring up to me at your sentencing.

THE DEFENDANT: Yup.

THE COURT: And that's important information.

THE DEFENDANT: Yeah.

THE COURT: No, understood. Okay.

THE DEFENDANT: I hope that makes you feel better about what I'm trying to say.

THE COURT: Yup.

All right. Mr. Odland, has your client said anything to you or have you noticed anything about him

regarding medication, drugs, alcohol, mental illness, or anything at all that might be affecting his actions, his judgment, his memory, or his ability to understand these proceedings today?

MR. ODLAND: No, your Honor.

THE COURT: Do you have any question in your mind that he's competent to enter a plea?

MR. ODLAND: I don't.

THE COURT: All right. Okay then, I'm going to take your plea -- your pleas.

THE DEFENDANT: Thank you.

THE COURT: To Count One of the superseding information, charging you with a conspiracy to straw purchase on or about September 11, 2023, to on or about February 23rd, 2024, in the District of New Hampshire and elsewhere, along with Melissa Longe and Dustin Tuttle, how do you plead, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: To Count Two, charging you with conspiracy to traffic firearms from at least on or about September 11, 2023, to on or about February 23rd, 2024, in the District of New Hampshire, along with Melissa Longe and Dustin Tuttle, how do you plead?

THE DEFENDANT: Guilty.

THE COURT: As to Count Three, charging you

with a sale of a firearm in furtherance of a felony, from September 11, 2023, to on or about February 23rd, 2024, in the District of New Hampshire, how do you plead, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Finally, Count Four, charging you with possession of a firearm by a prohibited person on or about October 19th, 2023, in the District of New Hampshire, how do you plead, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Okay. I accept your pleas. I adjudge you guilty of the offense.

There are a lot of findings I need to make in this case about what your sentence should be. I won't be able to do that until after I read the presentence report and when we conduct sentencing.

In the meantime, I will make the following findings.

Give me one second.

I'll make the following findings. I've questioned Mr. Jackson and his lawyer, Mr. Odland. They've both assured me that they've conferred with each other regarding this guilty plea, all aspects of the charges, and any defenses that Mr. Jackson may have.

I've observed Mr. Jackson making his answers, his demeanor and manner while answering all the questions, his

obvious intelligence and his attitude, and he doesn't appear to be under the influence of any type of medication, drug, or alcohol or mental illness or disorder, anything at all that might be affecting his competency to enter a plea.

I find that the guilty plea has a basis in fact based on Section 3 of the plea agreement and based on AUSA Hunter's proffer, both of which the defendant perceived and understood and admitted.

I find that the guilty plea is free of any coercive influence of any kind and that no promises have been made to Mr. Jackson in order to induce his plea other than those set forth in the written plea agreement on file with the Court.

I find that Mr. Jackson entered this plea competent and voluntarily, based on a full knowledge of the charges against him and the consequences of his plea.

Sentencing in this case is July 6th, 2026. The defendant will remain detained pending trial -- I mean pending sentencing. Excuse me.

Anything else for the Court?

MR. HUNTER: Nothing from the government, your Honor.

(Discussion between the defendant and counsel.)

MR. ODLAND: Nothing further --

THE DEFENDANT: Thank you.

MR. ODLAND: -- from the defense, your Honor.

THE COURT: All right. You good?

THE DEFENDANT: Good. Thank you.

THE COURT: All right. We're adjourned.

THE CLERK: All rise.

MR. HUNTER: Thank you, your Honor.

(Proceedings concluded at 4:01 p.m.)

C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 6/17/26 *_/s/ Liza W. Dubois_*
LIZA W. DUBOIS, RMR, CRR